PARKER *v.* PARKER, EXR.

(No. 653851—Decided January 12, 1965.)

*Mr. Thomas C. Ward,* for plaintiff.
*Mr. Earl J. Krock,* for defendant.

ANDREWS, Chief Referee. This matter arises upon a petition to vacate an order of this court approving the final and distributive account of Louis G. Parker (referred to in the petition as "Lewis" G. Parker), executor of the estate of John L. Parker. The petition alleges that the account is not a true and correct account by reason of the fact that the executor accepted payment of $1,500 on a promissory note which was not an estate asset, and did not deliver to petitioner, a payee on the note, the sum received in payment, but accounted for it as estate funds. The petitioner asks that the order of this court be vacated and that the executor be ordered to deliver the funds to petitioner, and for such other orders as may be just and proper. In his answer, the executor denies all the allegations of the petition not matters of record in this court.

On April 23, 1964, a hearing was held before another referee, following which the parties filed briefs.

On October 21, 1964, a journal entry was filed, signed by the presiding judge of this court, ordering that the journal entry approving the final and distributive account be vacated and set aside, in accordance with Section 2325.02, Revised Code. On the same date, the presiding judge, by memorandum, referred to me all other questions raised by the petition, "for disposition under the statutes." The memorandum also provided that journalization of the vacation order await final determination by the court, following receipt and review of my findings.

John L. Parker died on August 24, 1962, leaving a will executed on July 12, 1962. The will was probated on September 28, 1962, and, on the same date, testator's son Louis G. Parker was appointed executor.

Testator left surviving him a wife, Antonia F. Parker, and four children, Louis G. Parker, John H. Parker, Beth Parker Zack, and Rosemary Dormendo. Mrs. Antonia Parker was the children's stepmother.

By Item II of his will, testator bequeathed to his wife the household goods, furnishings, and equipment in and about his residence at the time of his death. By Item III he devised to her during her life or widowhood, the residence property, with

remainder in fee to the four children, share and share alike. By Item IV, all the residue of his estate was left to his four children, share and share alike.

The evidence adduced at the hearing shows an unusual situation so far as the promissory note is concerned. For the moment, in summarizing the evidence, I will not include the testimony of Antonia Parker, to all of which testimony counsel for the executor objected.

Counsel for the petitioner offered in evidence a negotiable promissory note for $1,500, dated December 23, 1961, and payable to the order of "John L. Parker or Antonia F. Parker," with interest at the rate of six per cent per annum for a period of two years. The note was signed by Beth P. Zack and Jay Chesler Zack, as makers. They are husband and wife. There being no time of payment expressed on the instrument, it was a demand note.

Mrs. Beth P. Zack testified that the note was in her handwriting. A copy of the note was substituted and admitted in evidence as applicant's exhibit 1. For clarity I will refer to this note as note A. Mrs. Zack's testimony discloses that actually she wrote two notes for the same transaction. I will refer to the other note as note B. Mrs. Zack calls note B the "original" and note A the "copy." She kept note B "at home," but delivered note A to her father, the testator.

Unfortunately, note B is not in evidence. Although a photostatic copy of it was offered, the referee excluded it under the "best evidence" rule. However, it was referred to without objection in the testimony.

There appears to be no doubt that notes A and B were identical except for a slight difference in the manner in which Mr. Zack signed his name. Clearly, Mr. and Mrs. Zack executed their promissory note in duplicate.

The note was given for a loan of $1,500, made by the testator to his daughter, Beth Zack, and her husband. This obligation to the testator did not appear on the inventory and appraisal or on the application for determination of the inheritance tax, because the executor knew nothing about it at the time. His testimony is most confusing as to when he learned about the loan, but the time of his acquiring this knowledge is not important in the solution of the present problem.

Likewise, there is confusion about whether an item in the amount of $1,475 on the application for determination of the inheritance tax represented this loan. Again, I do not think it matters, although the record and documents indicate to me that the $1,500 item was not included.

The $1,500 was paid to the executor sometime in October 1963, and the item appears on the final and distributive account as "10/ /63 Beth Zack, repayment of loan $1,500." The executor describes this as "the repayment of a loan that I didn't know existed."

The final and distributive account also shows the transfer of a life estate in the real property to the widow, with remainder to the children, and a distribution of one-fourth of the residuary estate to each child. Three children received $6,366.49 each, and one child received $6,366.50. There is nothing indicating transfer of any cash to the widow, and she has received no payment on the note. The final and distributive account was filed on October 25, 1963, and approved on December 9, 1963.

It will be recalled that Beth Zack testified that she kept the "original," which I have designated as note B. Consistently with this testimony, the executor said that he did not see the note until Beth paid it off and "signed it paid."

Up to this point I have given no consideration to the testimony of Mrs. Antonia Parker, the widow and petitioner. When she was called as a witness, counsel for the executor entered an objection "to all testimony by any parties in this action against the executor." The referee stated that he would allow the testimony, "reserving the right, of course, subsequently to determine as to whether it is admissible or whether it should be stricken * * *." Thereupon, counsel again objected to all Mrs. Parker's testimony and to the ruling of the referee. During the examination of Mrs. Parker, counsel made some specific objections to certain testimony, and at the conclusion of her examination, he again objected to all of it. The referee adhered to his previous ruling.

Naturally, counsel's general objection was based upon Section 2317.03, Revised Code, known colloquially as the "dead man's statute." That section provides: "A party shall not

testify when the adverse party * * * is an executor * * * of a deceased person except: * * *.''

It is obvious that Mrs. Antonia Parker and the executor are adverse parties. Mrs. Parker claims that the $1,500 belongs to her, whereas the executor claims that it belonged to the estate, and that he properly received, accounted for, and distributed it. The statute has reference to the adverse character of the parties at the time of trial rather than at the time of the transaction. 56 Ohio Jurisprudence 2d, Witnesses, Section 162.

Counsel for Mrs. Parker contends that her testimony is admissible under exception (E) of Section 2317.03, Revised Code, which reads:

''In an action or proceeding by or against a partner or joint contractor, the adverse party shall not testify to transactions with, or admissions by, a partner or joint contractor since deceased, unless they were made in the presence of the surviving partner or joint contractor, and this rule applies without regard to the character in which the parties sue or are sued.''

When the language of this exception is analyzed, it becomes apparent that the exception does not apply to the present case. The exception clearly contemplates a situation where a party is adverse to the joint contractors, not a situation where one joint contractor is adverse to a deceased joint contractor. The point is that if one joint contractor is still alive and was present during the transaction, he is in a position to give the joint contractors' side of the story, as against an outside adverse party. But where one joint contractor is adverse to a deceased joint contractor, there is no one to speak for the latter, and the reason for the exception is absent. Besides, John Parker and Antonia Parker were not joint contractors anyhow—they were alternative payees of a negotiable promissory note.

However, there is another exception to the prohibition of Section 2317.03, Revised Code, which is pertinent to this case; namely, exception (A). By that exception the adverse party may testify ''As to facts which occurred * * * after the time * * * the testator died.''

Some of Mrs. Parker's testimony comes within this exception, whereas some of it must be stricken under the general prohibition of the statute.

In order that the attorneys may know for the record exactly what I hold admissible and what must be stricken as inadmissible, it is necessary to refer to the transcript in some detail, despite the fact that this will substantially lengthen the opinion.

The examination of Mrs. Parker begins on page five. The first three questions and answers merely identify the witness and are admissible.

The last question on the page is: "And by reason of an antenuptial agreement, the original antenuptial agreement, the only thing you received, or was divided under the will was the life estate in the home, is that correct?" Answer: "That is right."

Obviously, the reference to an antenuptial agreement is inadmissible under the statute (Section 2317.03, Revised Code) and will be stricken. Moreover, no antenuptial agreement was offered in evidence. That part of the question dealing with what the witness received under the will is proper, and so far as the answer refers to it, the testimony is admissible under exception (A).

Starting with the first question on page six, and going down to, but not including, the last question on the page, the testimony relates entirely to facts which occurred after the testator's death, and is admissible under the same exception. Incidentally, this testimony is not germane to the matter before me.

At the bottom of page six, the witness is asked to identify applicant's exhibit 1 (note A), and her answer is, "Yes, Betty wrote this." Inasmuch as this testimony does not come within one of the statutory exceptions, it is inadmissible and is hereby stricken. For the same reason, the second answer on page seven, in which the witness states, "That's for $1,500 that my husband had given them," is likewise stricken.

The rule is well stated in 56 Ohio Jurisprudence 2d, Witnesses, Section 184, as follows:

"To entitle an adverse party to testify to facts which occurred before the death of the decedent, it must first appear that he comes within some one of the exceptions to the general rule established by the statute."

The next three questions and answers are merely descriptive of the note, which later was admitted in evidence, and their

admission cannot possibly harm the executor. Actually, the witness was merely reading the note aloud.

The next four questions and answers on page seven identify Mr. and Mrs. Zack, and are admissible.

The next question on page seven is, "Now, were you present when this note was signed?" The answer was "Yes." This is inadmissible and is stricken.

The last three questions and two answers on page seven relate again to the writing of the note by Beth Zack, and are therefore inadmissible and are stricken, although harmless in view of other evidence.

All the testimony on page eight and on the first sixteen lines of page nine is inadmissible and is stricken. It relates to occurrences at the time of the execution and delivery of the note and a few days later. The nature of some of this testimony shows the impact of Section 2317.03, Revised Code, upon the unsupported claim of a party adverse to an executor or administrator. Mrs. Parker testified at this point that her husband gave her the note and that he said, "Take care of it and see that you get it if I am not here." He never asked for it, and she had it in her possession until she gave it to her attorney.

Here is the crux of Mrs. Parker's case, yet under the statute I have no choice but to erase it from my mind.

The testimony commencing at line seventeen on page nine and running through page ten is limited to facts occurring after testator's death and is admissible. The same is true of the testimony on page eleven through line eight. On lines nine, ten, and eleven, the witness testifies to certain questions that she asked Beth Zack. This, too, is admissible under exception (A).

However, in the last part of line eleven, continuing through line twelve, the witness testified that Beth Zack said, "Louis, he says he is going to take care of it." The reference was undoubtedly to Louis Parker, the executor, who was not present. This is double hearsay and inadmissible, and it is hereby stricken. See McCormick, Evidence 461 (1954). Louis Parker not being present, there can be no admission by conduct. And the alleged admission by words was not made to the witness, but to a third party who told the witness about it.

There follow some questions and answers on page eleven which were stricken by the referee as hearsay and therefore are no part of the record.

The final question and answer are on page twelve and are admissible. Mrs. Parker there testified that she never received payment on the note referred to as applicant's exhibit one.

When we examine the testimony of Mrs. Antonia Parker which has been admitted, we find it to be of little significance.

At a family meeting shortly after Mr. Parker's death, at which time the will and the assets of the estate were discussed, Mrs. Beth Zack did not tell the other children of the testator that she owed her father on a note for $1,500. Mrs. Zack explained her silence by testifying that she considered this a confidential matter between her father and herself.

On December 24, 1963, Antonia Parker had her first conversation with Beth Zack about payment of the note. Mrs. Parker was at the Zacks' house for dinner, and only the three of them were there. Mrs. Parker said to them, "The 23rd was yesterday. You can pay me the money anytime now." Beth Zack said she had paid it to "Louis." Mrs. Parker then asked whether Louis had given her the money, or "father," undoubtedly meaning the testator. Beth's reply to her, reporting what Louis said, was excluded by me as hearsay, and cannot be considered.

In his cross-examination of Beth Zack, counsel for petitioner did not refer to the above conversation, nor did the witness.

Mrs. Parker's testimony indicates that she thought she was entitled to the money, but there is nothing in the testimony of the other two witnesses showing that they admitted this.

Considering the competent evidence, we are faced with a most peculiar and difficult situation.

It will be recalled that a note payable to the order of two payees in the alternative was made in duplicate. The makers retained what they called the "original," and delivered to one payee, the decedent, what they called the "copy." That payee died, and the note subsequently turned up in the possession of the surviving payee. Sometime in October, 1963, one of the makers, Mrs. Beth Zack, took what she called the "original,"

and what I have designated as note B, to the executor, paid him the $1,500, and obtained his receipt on the note. He distributed this to the children, including himself, as part of the residuary estate.

The gist of the controversy relates to the ownership of the funds representing payment of the note. This is not governed by the law of negotiable instruments, but depends upon the arrangement between the two payees. Britton, Bills and Notes, Section 81, page 191 (2 Ed. 1961). I will not burden this opinion by citing the innumerable cases on this obvious point.

However, the law of negotiable instruments is pertinent in deciding whether note A or note B is the effective document. The date on these duplicate notes is December 23, 1961. This means that they are not governed by the new Uniform Commercial Code. See Title 13, Page's Ohio Revised Code Annotated, 1962 Replacement, "Introduction," and Section 3, Amended Senate Bill No. 5, at pages XIX et seq. of the same volume. Instead, they are governed by the former statutes, *i. e.*, the Negotiable Instruments Law.

By former Section 1301.18, Revised Code, every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect to it. Since note B, which Mrs. Zack calls the original, was never delivered, it never became effective as a promissory note. On the other hand, note A, which Mrs. Zack calls the copy, was delivered to her father. Unless this is regarded as "the note," then there never was any effective note. Yet the testimony indicates that the witnesses considered that a note had been issued and was an effective document. Despite Mrs. Zack's designation, I must hold that note A, which was delivered to the deceased, is the only effective note.

It is unnecessary for me to determine whether the payment by Mrs. Zack to the executor was a proper payment which discharged the instrument under the law of negotiable instruments. This is not a suit on a negotiable instrument; rather, as already explained, it is a contest over the ownership of the funds already paid to the personal representative of one of the alternate payees and claimed by the other.

The difficulty in the present case lies in the fact that the

competent evidence is insufficient to show what arrangement the payees had in mind as to ownership of the note and its proceeds. As already observed, because of Section 2317.03, Revised Code (the "dead man's statute"), I must erase from my mind a large and significant part of Antonia Parker's testimony. This type of statute has been severely criticized. See, for instance, McCormick, Evidence, Section 65 (1954). But it is still the law in Ohio, and, while it is bound to work an injustice in some cases, it protects estates against alleged claims supported by nothing except the claimant's word. Unfortunately, its enforcement penalizes the honest person along with the fraudulent.

We can reject at once any idea that Mrs. Parker owned the funds by reason of a technical joint tenancy or contract of survivorship. Joint tenancy with the incidental right of survivorship does not exist in Ohio. *In re Estate of Hutchison* (1929), 120 Ohio St. 542. However, the same case holds that parties may contract for a joint ownership with the right of survivorship. See, also, *Cleveland Trust Co.* v. *Scobie* (1926), 114 Ohio St. 241. These cases do not help petitioner because there is nothing even faintly resembling a contract of survivorship in the present case.

When a husband buys real property with his own money, but takes title in the joint names of himself and his wife, there is a presumption that he intends to make a gift to his wife of an undivided one-half of the property. *Eisenzimmer* v. *Connecticut Fire Ins. Co.* (1924), 27 Ohio App. 366; *Lipps* v. *Lipps* (App. 1949), 54 Ohio Law Abs. 425.

The same presumption has been applied in the case of certificates of deposit and savings accounts, payable to A or B, with no provision for survivorship. *Foraker* v. *Kocks* (1931), 41 Ohio App. 210 (certificate of deposit); *In re Estate of Thatcher* (Prob. Ct. 1933), 30 Ohio N. P. (N. S.) 515 (bank account); *Waltenberger* v. *Pearson* (1946), 81 Ohio App. 51 (savings account); *In re Chittock* (Prob. Ct. 1952), 65 Ohio Law Abs. 432 (savings account); *In re Schroeder* (Prob. Ct. 1957), 75 Ohio Law Abs. 555 (certificates of deposit; savings accounts); *In re Estate of Ray* (Prob. Ct. 1958), 79 Ohio Law Abs. 368 (bank account).

It is significant that these cases do not differentiate between A *and* B, on the one hand, and A *or* B, on the other, so far as ownership upon the death of A is concerned. Admitting that there are certain technical differences, it seems logical and equitable to handle the two alike in a contest for ownership after A.'s death. As stated in the *Schroeder case, supra,* "Further, whether the conjunctive used is 'or' or 'and' is academic as either one shows a joint interest."

The *Schroeder case* has been referred to as a "practical opinion." 9 Western Reserve Law Review 354 (1958).

It must be conceded that in some of the cases just cited, it is suggested that the presumption of equal interest is effective only in the absence of evidence about the source of the fund. And this idea is crystalized, so far as bank accounts are concerned, in a Supreme Court decision, *Bauman* v. *Walter* (1953), 160 Ohio St. 273. The syllabus pretty much tells the story. It reads:

"Where two parties deposit money which belongs to one of such parties and such deposit is made in the names of one *or* the other of such parties, and where the contract of deposit provides that such deposit is payable to either of such two parties but there is no provision that such deposit shall be payable to the survivor, and where the party to whom such money originally belonged dies, and where there is no evidence that any passbook for the deposit had been delivered to the surviving party with intent to pass title to the deposit, such survivor has no right to any part of such deposit."

The court did say, however, that where there is no evidence as to ownership of the money deposited, there may be some justification for indulging the presumption that the depositors have an equal interest in the amounts of such deposits. But, said the *Bauman* opinion, the money belonged to the wife (who was murdered by her husband), and if the husband was entitled to any part of it, or of the bank's obligation, it must have passed somehow from the wife to the husband. This did not occur, said the court. The wife retained complete power to withdraw all or any part of the money deposited, and did not relinquish dominion and control over it. There was no delivery to the husband of any passbooks, the presentation of which would be

necessary to effect withdrawals. Thus, an essential element of a gift was lacking.

The judge who decided *In re Schroeder* (Prob. Ct. 1957), 75 Ohio Law Abs. 555, thought that *Bauman* v. *Walter, supra,* was decided on the particular situation there involved, including the moral factor, meaning, supposedly, the murder of the wife by the husband. He pointed out that the law of the *Bauman case* could not be followed to its logical conclusion. "For instance," he said, "if this case were to apply to real property, then tenancy in common as such in Ohio would be defeated." He also called attention to the burden placed upon estate fiduciaries under the theory of contribution proclaimed by the *Bauman* decision.

Whatever we may think of *Bauman* v. *Walter,* as applied to bank accounts, I do not believe that it should be extended to the situation present in the instant case. We are not dealing with the deposit of money in a bank, over which the original owner retains dominion and control. We are dealing with a negotiable promissory note issued to two people in the alternative. A second name might well be added to a bank account for reasons of convenience or to establish an agency relationship. But in the absence of evidence to that effect, there is no reason to make such an assumption in the case of a promissory note payable to a husband or his wife, in the alternative, and unrelated to any bank deposit. This is true even though the money furnished in the transaction came entirely from one of the two payees. It is much more realistic to presume that the husband, who loaned the money, had his wife's name included as a payee in order to give her an interest in the note and its proceeds.

What interest? The presumption that he intended to give a half interest seems to me to be the most logical and the one most in accordance with the probabilities.

There is a surprising scarcity of decisions. Practically all the "A or B" cases, both in Ohio and elsewhere, deal with bank deposits.

However, the case of *Collyer* v. *Cook* (1902), 28 Ind. App. 272, 62 N. E. 655, deals with promissory notes and takes the same view as mine. The husband sold real property owned by him, and received in payment notes payable to himself or his

wife. Upon his death, followed by his wife's death, it was held that each estate was entitled to one-half interest in the notes and to one-half of the proceeds. The court reasoned that the husband must have intended to give his wife some interest and also to retain some interest for himself. Notes so executed could not import a gift of the whole proceeds to his wife, thought the court. The equitable conclusion is that the notes and proceeds belong to both equally. See, also, *Newitt* v. *Dawe* (1943), 61 Nev. 472, 133 P. 2d 918.

Although these two cases contain some other factors and some questionable language, I think that basically they adopt the "half and half" principle which I am advocating.

There is an excellent dictum in *In re Estate of Miller* (1956), 248 Iowa 19, 79 N. W. 2d 315, reading as follows:

"The general rule is * * * that the presumption is that any instrument, whether pertaining to realty or personalty, in which two or more persons are grantees, or payees, creates in them a tenancy in common in the absence of expression of a contrary intent."

Inasmuch as the *Miller case* related to debentures payable to A or B, the court's dictum indicates that A or B is to be treated the same as A and B in this setting.

An earlier Iowa case held that where a husband bought a note and mortgage and had them assigned "to William and Jane Hirst," the transaction of itself was sufficient to show a gift to the wife of a one-half interest in the note and mortgage. Thus, as against the heirs of the deceased husband, the wife was entitled to a one-half interest. *Abegg* v. *Hirst* (1909), 144 Iowa 196, 122 N. W. 838.

Even where bank deposits are involved, evidenced by certificates of deposit, there is some authority upholding the doctrine of equal owership. *Engelbrecht* v. *Engelbrecht* (1926), 323 Ill. 208, 153 N. E. 827, where the court said:

"Where a promissory note or certificate of deposit is made payable to two or more persons without designating the proportion each is to take, the law presumes that they were to take equal shares."

The certificates in the *Engelbrecht case* were "A or B" certificates.

Another good case is *McConnell* v. *Fayette County Bank*

(1928), 8 Tenn. App. 461. There the deposit was by A, and the certificates of deposit were "A or B" certificates. The chancellor held that the deposit belonged to A's administrator, and that B was not entitled to any part of it. The appellate court reversed, holding that one-half of the deposit belonged to A's estate and one-half to B. The court said that a certificate of deposit amounts in all essential respects to a promissory note and should be governed by the same rules. For the purposes of the problem presented, the court construed "A or B" in the same manner as "A and B," and held that B was entitled to be treated as a joint owner, and, as such, entitled to one-half of the deposit evidenced by the certificate.

The contrary argument that because A's money alone went into the deposit, A is the sole owner in the absence of evidence showing a gift or other transfer to B, while apparently the law in Ohio as to bank accounts (*Bauman* v. *Walter, supra*), should not be extended to the present situation.

I hold that when the note was issued, payable to the order of John L. Parker or Antonia F. Parker, a presumption arose that each had an undivided one-half interest in the note, and that consequently each was entitled to one-half of the proceeds.

Is there sufficient evidence to overcome the presumption? There is no evidence whatsover that John L. Parker intended to reserve for himself the complete ownership of the note or its proceeds, thereby depriving his wife of the one-half interest given her by virtue of the presumption.

Did he make a gift of his one-half interest in the note to Mrs. Parker? Ohio is very definite on the point that evidence of a gift must be clear and convincing, both as to the intention to make a gift and delivery pursuant to that intention. *Bolles* v. *Toledo Trust Co.* (1936), 132 Ohio St. 21; *In re Estate of Fife* (1956), 164 Ohio St. 449. And see the definition of clear and convincing evidence in *Cross* v. *Ledford* (1954), 161 Ohio St. 469.

No analysis of the competent evidence need by presented to support the conclusion that there is no clear and covincing evidence of a gift. Again, it must be borne in mind that Mrs. Parker's testimony relating to events and conversations before her husband's death has been excluded from consideration. The remaining testimony is extraordinarily meager, and falls far short of the required quantum of evidence.

Counsel for petitioner argues that petitioner's possession of the note creates an irrebuttable presumption that she owned it and the obligation it represented. Counsel is evidently referring to former Section 1301.18, Revised Code, which corresponds to Section 16 of the *Negotiable Instruments Law*. The only irrebuttable presumption referred to in that section is that when the instrument is in the hands of a holder in due course, a valid delivery by all prior parties so as to make them liable to him is conclusively presumed. By no stretch of the imagination can it be said that Mrs. Parker was a holder in due course.

The last sentence of the section reads as follows: "When the instrument is no longer in the possession of a party *whose signature appears thereon,* a valid delivery by him is presumed until the contrary is proved." (Emphasis mine.)

Inasmuch as John L. Parker's signature does not appear on the instrument, the statutory presumption is inapplicable. The presumption arises only in cases where, for example, an indorsement by the payee appears on the instrument, and it is in the possession of the plaintiff. See Beutel's Brannan, Negotiable Instruments Law (7ed. 1948) page 392, stating that there is no presumption of delivery by the payee to an alleged transferee without indorsement who has possession of the note, since the payee's signature does not "appear thereon." The author cites *Allen* v. *Hays* (1917), 139 Tenn. 56, 201 S. W. 135. The court in that case points out that even at common law, "The presumption in such case is that the notes, unindorsed when collected, were yet the property of the payee." See 50 L. R. A. (N. S.) 588. For a good example of the stituation in which the presumption applies, see *Bode* v. *Werner* (1904), 4 C. C. (N. S.) 158, 16 C. D. 206, affirmed without opinion, 74 Ohio St. 441. (Suit against *indorser*, who claimed nondelivery of note to plaintiff. Delivery presumed.)

Moreover, as observed by the court in *Collyer* v. *Cook* (1902), 28 Ind. App. 272, 62 N. E. 655, involving "A or B" notes: "The fact that either payee may at any particular time have had possession would not enlarge his rights nor diminish the rights of the other payee."

Conclusions of Law and Recommendations

1. Antonia F. Parker and John L. Parker each had an undivided one-half interest in the promissory note dated December

23, 1961, signed by Beth P. Zack and Jay Chesler Zack, and payable to the order of John L. Parker or Antonia F. Parker.

2. Upon the death of John L. Parker, his undivided one-half interest became part of his estate.

3. Antonia F. Parker became entitled to one-half the proceeds paid on the note to the executor, i. e., $750; and the estate of John L. Parker became entitled to the other half, i. e., $750.

4. Journalization of the journal entry filed October 21, 1964, which vacated and set aside the journal entry of December 9, 1963, approving the final and distributive account, was postponed pending final determination by the Court following the receipt and review of the findings of the Chief Referee. (See Memorandum filed Oct. 21, 1964, by Presiding Judge Frank J. Merrick.) The journal entry filed October 21, 1964, should now be journalized, thus setting aside the above order of December 9, 1963, approving the final and distributive account, and thereby reopening the estate of John L. Parker for further administration.

5. Each of the residuary legatees under the will of John L. Parker, namely, Louis G. Parker, John H. Parker, Beth Parker Zack, and Rosemary Dormendo, has received by way of distribution from the executor $187.50 more than he or she is entitled to receive.

6. The estate being reopened, the executor should be directed to cause proper distribution to be made of the $1,500 representing payment of the said promissory note, in accordance with this report and opinion, so that Mrs. Antonia Parker will receive $750, representing her one-half interest in the proceeds of the promissory note, and each of the children of John L. Parker, the testator, i. e. Louis G. Parker, John H. Parker, Beth Parker Zack, and Rosemary Dormendo, will have received the sum of $187.50 from the proceeds of the said promissory note instead of the $375 which each has received from such proceeds in connection with the distribution by the executor of the residuary estate.

7. Inasmuch as Louis G. Parker, executor of the estate of John L. Parker, has improperly distributed part of the proceeds of the said promissory note, as set forth above, he is responsible for correcting the error and making proper distribution of the proceeds.

8. Louis G. Parker, exector of the estate of John L. Parker, should be directed to file an amended final and distributive account reflecting a proper transfer and disposition of the funds representing the proceeds of the said promissory note.

9. Costs of this proceeding should be borne equally by the petitioner, Antonia F. Parker, and Louis G. Parker, executor of the estate of John L. Parker.

*Petition granted.*