86 F.3d 1155
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
LIBBEY-OWENS-FORD CO., Plaintiff-Appellant,
v.
Ronald W. SKEDDLE; Darryl J. Costin; Edward B. Bryant;
Swr Corp.; CJD Business Corp.; BBE Investment
Corp.; Marcella T. Skeddle; Jennifer
L. Costin; Cheryl Bryant,
Defendants-Appellees.
 No. 95-3813.
 United States Court of Appeals, Sixth Circuit.
 May 31, 1996.
 
 Before: KEITH and SILER, Circuit Judges; GIBBONS, District Judge.*
 SILER, Circuit Judge.
 
 
 1
 Plaintiff Libbey-Owens-Ford Company ("LOF") appeals the district court's modification of an agreed preliminary injunction order which originally had frozen all of the assets belonging to Ronald W. Skeddle, Darryl J. Costin, and Edward B. Bryant, the defendants. LOF raises two challenges to the district court's decision: 1) the defendants' wives do not have a one-half interest in property jointly owned by the defendants and their wives; and 2) the institution of criminal proceedings against the defendants is not a sufficient change of circumstances to warrant modification of the freeze order. For the reasons that follow, we affirm the district court.
 
 I.
 
 2
 The defendants are former officers and directors of LOF. LOF filed a federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., action which alleges that the defendants conducted three self-dealing schemes.[1] The complaint included claims for breach of fiduciary duty, fraud, conspiracy, and unjust enrichment.[2] LOF alleged that the fraud began in November 1990, when the defendants formulated the Outsourcing Scheme. With this scheme, the defendants caused LOF to enter into a data processing services contract with a corporation called CTM. LOF claimed the defendants received kickback payments from CTM for the contract and the defendants intended to secretly own CTM. As a result of kickback payments, CTM paid the defendants approximately $7.7 million. The defendants did not disclose to LOF the kickback payments nor their intended interest in CTM.
 
 
 3
 The Gas Well Scheme was the second stratagem allegedly devised by the defendants. In January 1991, the defendants conspired to purchase LOF's gas wells at less than fair market value. The defendants concealed their interest in the purchase by creating a sham bidding process in which a "friendly" company submitted a pre-arranged high bid. The friendly company then turned over ownership of the gas wells to another company, ESMO Inc., which was formed and controlled by the defendants. Kickbacks from the Outsourcing Scheme funded the purchase of the gas wells. ESMO paid over $1.1 million in profits from the Gas Well Scheme to the defendants. The defendants did not disclose to LOF that the bidding process was fixed and that the defendants were the actual buyers.
 
 
 4
 In January 1993, the defendants' third plan, the Robot Leasing Scheme, involved a leasing contract for sophisticated robots. The defendants allegedly intended to cause LOF to enter this contract at an excessive price from a leasing company in which the defendants were to have an interest. A personal friend of defendant Costin, Dr. Clarence Martin, was engaged to act as president of the leasing company. The defendants did not disclose to LOF that they were to have an interest in the leasing company. Apparently, LOF did not make any payments under the Robot Leasing contract.
 
 
 5
 The defendants funnelled the fraudulently obtained funds through two layers of sham corporations. The kickback payments from CTM were transferred to three paper corporations headed by Dr. Martin as president. The payments were made at the rate of $265,000 per month to Dr. Martin's three corporations in exchange for "consulting services." Dr. Martin's three corporations then transferred the payments to three "alphabet companies" controlled by the individual defendants: SWR Corp., CJD Corp., and BBE Investment Corp. The defendants' reverse initials identified the three corporations. Profits from the Gas Well Scheme were similarly funnelled through to ESMO and then to the alphabet companies.
 
 
 6
 LOF discovered the schemes and later terminated the defendants in May 1993. LOF alleged that approximately $9 million was fraudulently obtained by the defendants. LOF also alleged that a certified public accountant traced at least $4 million of deposits into accounts owned by the defendants or their families.[3] According to LOF, most of the fraudulently obtained money has been spent or commingled with other assets of the defendants and their families.
 
 II.
 
 7
 On December 22, 1993, LOF filed suit seeking the imposition of a constructive trust and the arbitration of its claims for compensatory and treble damages under RICO, 18 U.S.C. § 1961 et seq. On December 29, 1993, District Judge Potter found "that [LOF] is threatened with irreparable harm unless the defendants are restrained from further asset transfer." Judge Potter then granted LOF's application for a temporary restraining order and provided that the defendants may expend assets "not derived in any respect from defendants SWR, BBE, and CJD" for normal, daily transactions not in excess of $1000. On January 6, 1994, Marcella T. Skeddle, Jennifer L. Costin, and Cheryl Bryant, the defendants' wives, moved to intervene to narrow the temporary restraining order. On January 20, 1994, Judge Potter authorized the defendants to access funds that were neither derived from the alphabet companies nor commingled with fraud-derived funds to pay for attorneys fees, tuition, and taxes. On January 28, the defendants' wives moved to modify or dissolve the injunction as it applied to them. On February 2, 1994, LOF and the defendants entered into an agreed preliminary injunction which continued the terms of Judge Potter's temporary restraining order. The defendants and LOF, however, retained the right to challenge the scope of the injunction. On February 23, 1994, Judge Potter denied the wives' motion to modify or dissolve the injunction and noted:
 
 
 8
 Even if the Court accepts that the defendant-intervenors were not acting in concert with their husbands, that [sic] tainted assets placed in the hands of an innocent donee can be subject to a constructive trust. See, e.g., In re Marriage of Allen, 724 P.2d 651, 660 (Colo.1986). The constructive trust imposed on defendants' assets will continue over any assets or property of defendant-intervenors that are derived from or commingled with any of defendants' assets.
 
 
 9
 Cheryl Bryant subsequently filed a Motion for Partial Summary Judgment and To Modify the Injunction on July 21, 1994. In addition to Mrs. Bryant's motion, the defendants orally moved for modification to enable them to engage criminal defense counsel. In July 1995, the district court, Judge Carr, modified the previous injunction as it affected the wives' interest in jointly owned property and as it affected the defendants' access to assets for their criminal defense. As for the first issue, the district court held that the wives have a right under Ohio law to expend, without restriction, their undivided one-half interests in "assets held jointly with right of survivorship, provided their interest in such assets was acquired prior to the date of the onset of the defendants' alleged fraud." Regarding the second issue, the district court held that the defendants may expend untainted funds and, when such funds are exhausted, tainted funds for purposes of their criminal defense.[4]
 
 III.
 
 10
 Both parties agree that the district court's modification of the preliminary injunction is subject to an abuse of discretion standard of review. See First Technology Safety Sys., Inc. v. Depinet, 11 F.3d 641, 647 (6th Cir.1993) (reviewing the grant or denial of a preliminary injunction for an abuse of discretion). An abuse of discretion obtains "when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." Id. (citation omitted).
 
 
 11
 A. The wives have an undivided one-half interest in jointly owned pre-fraud property with right of survivorship.
 
 
 12
 The wives' joint ownership interest in the defendants' property is determined by Ohio law. See In re Hutchison's Estate, 166 N.E. 687, 690 (Ohio 1929). In Hutchison, a husband purchased stock with funds from a bank account held jointly with his wife. With respect to the spouses' interests in the stock while both were alive, the court concluded that property purchased for ownership in common, during joint lives, and with a right of survivorship vested an undivided one-half interest in each spouse. Id. at 687-688. Joint and survivorship bank accounts and certificate of deposits are the exception to the rule in Hutchison. During the lifetime of the parties, a joint and survivorship account belongs to the parties in proportion to the contributions made by each party, unless there is clear and convincing evidence of a different intent. Thompson v. Botts, 423 N.E.2d 90, 94 (Ohio 1981); see also Kristofik v. Bank One, Akron, 517 N.E.2d 272 (Ohio Ct.App.1986) (quoting Thompson and holding presumption of ownership in proportion to contribution of joint tenants in certificate of deposit with survivorship provision).[5]
 
 
 13
 In the present case, the district court clarified the preliminary injunction by expressly allowing the wives "to expend without further restriction their undivided one-half interest in assets held jointly with right of survivorship, provided their interest in such assets was acquired prior to the date of the onset of the defendants' alleged fraud." LOF argues that the law of the case doctrine should have barred the district court from modifying Judge Potter's previous order denying the wives' January 28, 1994, motion to modify the injunction. Under the law of the case doctrine, "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." United States v. Todd, 920 F.2d 399, 403 (6th Cir.1990) (citation omitted). Even if the doctrine applied here, the district court has the power to revisit prior decisions of its own or of a coordinate court. Id. (citations omitted).
 
 
 14
 The district court's order is consistent with the previous order entered by Judge Potter on February 28, 1994. The previous order noted that pre-fraud or unrelated assets (such as a savings account funded by a wife's separate earnings) were not subject to the injunction. LOF argues that the district court should have concluded that the wives have a right to jointly held property only to the extent of the wives' contributions. According to Ohio law, LOF's argument is meritless, unless the property is a joint and survivorship account or certificate of deposit. See Thompson, 423 N.E.2d at 94; Hutchinson, 166 N.E.2d at 687-88.
 
 
 15
 Alternatively, LOF argues that the district court's order granting the wives' motion does not comply with FED.R.CIV.P. 65(d). The district court's order does not violate the specificity requirement of FED.R.CIV.P. 65(d) as the order could easily be interpreted to allow the wives a one-half interest in any assets which are: 1) purchased prior to November 30, 1990, i.e., prior to the alleged fraud; 2) jointly held with right of survivorship, excluding bank accounts and certificates of deposit; and 3) not commingled or improved with fraud-derived funds; or 4) entirely unrelated to the fraud, such as a savings account funded solely by a wife's earnings. In conclusion, the district court did not abuse its discretion in allowing the wives access to their undivided one-half interests in pre-fraud assets.
 
 
 16
 B. The institution of criminal proceedings is a change of circumstances warranting modification of the preliminary injunction.
 
 
 17
 LOF cites United States v. Swift & Co., 286 U.S. 106 (1932), for the proposition that the agreed preliminary injunction order cannot be modified without a significant change of circumstances. This court has noted that a consent decree can be modified by " '[n]othing less than a clear showing of grievous wrong.' " Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141, 1148 (6th Cir.1992) (quoting Swift, 286 U.S. at 119), cert. denied, 509 U.S. 905 (1993). Although LOF and the defendants consented to the preliminary injunction, both retained the right to appeal the scope of the injunction. Therefore, it is difficult to describe the present injunction as a consent decree with regard to its scope. Regardless of whether the agreement between LOF and the defendants is a consent decree, a change of circumstances here justifies the district court's modification.
 
 
 18
 The Eighth Circuit utilizes the requirement of "changed circumstances" to modify a consent decree; however, when the changed circumstances involve fact rather than law, greater deference is given the district court's decision to modify. McDonald v. Armontrout, 908 F.2d 388, 390 (8th Cir.1990) (citing cases including Swift ); but see Omaha Indem. Co. v. Wining, 949 F.2d 235, 239 (8th Cir.1991) (holding that when modifying preliminary injunction, district court not bound by strict standard of changed circumstances but may modify in light of subsequent changes in law or facts).[6] Whether a significant change of circumstances or an upset of the status quo, the institution of criminal proceedings against the defendants is a change warranting modification of the preliminary injunction. The defendants argue, by analogy to civil forfeiture cases, that a freeze of all assets would deprive defendants of counsel of their choice. The defendants cite United States v. Michelle's Lounge, 39 F.3d 684 (7th Cir.1994), for the proposition that they have the qualified right to counsel of their choice. LOF counters with Caplin & Drysdale v. United States, 491 U.S. 617, 626 (1989), in which the Supreme Court stated: "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney." The defendants, however, wish to expend their untainted and tainted assets, not the fraud-derived [LOF's] assets. See id. at 625 ("The [CCE] forfeiture statute does not prevent a defendant who has nonforfeitable assets from retaining any attorney of his choosing.") (emphasis added). In Caplin, the Court described potentially forfeitable assets as the property acquired as a result of drug law violations. Id. at 619-20. Similarly in this case, the assets subject to the constructive trust are those acquired as a result of the defendants' alleged fraud and breach of fiduciary duty.
 
 
 19
 In the instant case, the defendants have a critical interest in assets not subject to the constructive trust. The interest at stake " 'is not merely a defendant's wish to use his property in whatever manner he sees fit. Here, the interest is augmented by an important liberty interest: the qualified right, under the Sixth Amendment, to obtain counsel of choice.' " Michelle's Lounge, 39 F.3d at 697-98 (citation omitted). The Michelle's Lounge court concluded, as did the district court in the present case, that a criminal defendant's right to counsel of choice is indeed weighty. Id. at 698. The institution of criminal proceedings against the present defendants and the defendants' right to counsel militate in favor of a modification of the injunction. The institution of criminal proceedings is a significant change of facts warranting modification of the injunction in the present case. And because the modification did not allow expenditure of fraud-derived assets, the district court's decision was not an abuse of discretion. The defendants' significant right to counsel of their own choosing outweighs the need to freeze all of the defendants' assets in this case. See Wheat v. United States, 486 U.S. 153, 158 (1988) (providing a presumption in favor of a defendant's counsel of choice).
 
 
 20
 This conclusion is reinforced in two ways. First, LOF previously argued before the district court that the imposition of criminal charges against the defendants was a significant change of facts, warranting sequestration of the defendants' assets. LOF cannot stand on both sides of this proposition. Second, LOF did not object to the district court's order of January 3, 1994, which granted permission to the defendants to pay their civil defense counsel. Certainly, LOF cannot now claim that the defendants have less right to pay criminal defense counsel. See Michelle's Lounge, 39 F.3d at 698 ("[W]e find that a civil forfeiture claimant's interest is significantly diminished when he seeks assets to pay attorneys in the civil forfeiture action as opposed to a related criminal action.").
 
 
 21
 LOF argues, however, that even if there is a significant change of circumstances, the defendants must be required to prove that the assets they wish to expend are not fraud-derived, otherwise a potential damages award on LOF's behalf may be left unsatisfied. Defense counsel's concession at oral argument, however, resolves LOF's concern that the defendants may expend fraud-derived assets. During argument, counsel for the defendants agreed to allow LOF to discover the records of the third-party financial institutions that maintain the defendants' assets. We, of course, note that the extent of LOF's discovery may not include any incriminating statements attributable to the defendants. Therefore, despite the current stay of discovery, LOF may monitor the defendants' withdrawal of assets to ensure that there is no improper dissipation. As a final safeguard, LOF retains the remedy of seeking another modification of the injunction if LOF's monitoring reveals that the assets in question are improperly withdrawn by the defendants.
 
 
 22
 C. The district court's consideration of LOF's insurance coverage was not an abuse of discretion.
 
 
 23
 LOF argues that the district court improperly considered LOF's insurance coverage for losses resulting from defendants' alleged fraud. LOF cites the collateral source rule as authority for its argument. In Ohio, the collateral source rule provides "that benefits the plaintiff receives from a source wholly independent of the wrongdoer should not benefit the wrongdoer by reducing the amount of damages which a plaintiff might otherwise recover from him." Klosterman v. Fussner, 651 N.E.2d 64, 67 (Ohio Ct.App.1994), lv. denied, 649 N.E.2d 281 (1995). The rule also bars the introduction into evidence of collateral payments to the plaintiff in order to prevent any influence on the jury's determination of damages. Id. However, the rule does not apply in the present situation because the district court is merely weighing, pre-trial, the amount of protection LOF equitably deserves against the defendants' right to obtain counsel with legitimate assets. LOF has not yet presented its case nor won a damages award, and it cannot expect a constructive trust over assets which are neither fraud-derived nor commingled. Hence, the district court's consideration of the amount of LOF's security, including insurance, was not an abuse of discretion. The district court was merely tailoring the scope of the injunction to the amount of plaintiff's potential recovery. See Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 198 (3d Cir.1990) (holding that district court must tailor scope of injunction to the likely size of plaintiff's potential damages award).
 
 IV.
 
 24
 The district court has broad discretion in equitable matters such as the modification of an injunction, and we cannot say that its decision in this case was an abuse of this discretion. However, despite the current stay of discovery, LOF may discover the defendants' assets and monitor the withdrawal of these assets based upon defense counsel's concession during oral argument. Additionally, LOF may subsequently return to the district court and seek to modify the injunction anew.
 
 
 25
 AFFIRMED.
 
 
 
 *
 The Honorable Julia S. Gibbons, Chief United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 A criminal proceeding against defendants is pending in the Northern District of Ohio
 
 
 [2]
 The complaint also sought a preliminary injunction, a constructive trust, restitution and punitive damages, and RICO treble damages
 
 
 [3]
 The wives of defendants Bryant and Costin were officers of the respective alphabet companies, and Costin's wife was also a director of CJD. The wife of defendant Skeddle admitted writing checks on the SWR corporate account at Skeddle's direction
 
 
 [4]
 The district court described three categories of funds: 1) "untainted," meaning assets obtained before the fraud and not commingled with fraud-derived assets; 2) "tainted," meaning assets obtained prior to the fraud and commingled; and 3) "fraud-derived" assets
 
 
 [5]
 Where there is no express right of survivorship or expression of a contrary intent, the general rule under Ohio case law creates a presumption of a tenancy in common where two or more persons are grantees or payees; this holds true whether the property is realty or personalty. Parker v. Parker, 203 N.E.2d 513, 522 (Ohio Probate Ct.1965). In Parker, the court noted that a husband who buys property with his own money, but takes title in the joint names of himself and his wife, is presumed to make a gift to his wife of an undivided one-half interest in the property. Id. at 520. Noting that the same presumption applies to savings accounts, bank accounts, and certificates of deposit, the Parker court extended the rule to a promissory note payable to joint payees
 
 
 [6]
 The Second Circuit distinguishes modification based upon the preliminary or permanent nature of the injunction. A preliminary injunction is entered to maintain the status quo until a hearing on the merits, while a permanent injunction is granted after such a hearing. Sierra Club v. United States Army Corps of Eng'rs, 732 F.2d 253, 256 (2d Cir.1984). According to Sierra Club, a court has the same discretion in modifying that it would have in initially granting or denying a preliminary injunction; however, a court must find a significant change of circumstances in the law or facts to warrant modification of a permanent injunction. Id. at 256-57