Samuel L. McDONALD; Gerald M. Smith; Rayfield Newlon; Thomas Henry Battle; Alan J. Bannister, Class certified 1/15/86 to consist of all persons presently confined under sentence of death in the Potosi Correctional Center and all persons who in the future will be confined under sentence of death by the Mo. Dept. of Correction, Appellants,

v.

Bill ARMONTROUT; Lee Roy Black; Donald Wyrick; John Ashcroft, Appellees.

No. 89–2152.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1990.

Decided July 16, 1990.

---

Richard H. Sindel, Clayton, Mo., for appellants.

Deborah Neff, Jefferson City, Mo., for appellees.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.

BOWMAN, Circuit Judge.

This case concerns the constitutionality of certain modifications ordered by the District Court[1] in a consent agreement between appellees Bill Armontrout, warden of the Missouri penitentiary, Lee Roy Black, Director of the Department of Corrections of the state of Missouri, Donald Wyrick, Director of the Division of Adult Institutions of the Missouri Department of Corrections, and John Ashcroft, Governor of the State of Missouri, and appellants, a class consisting of all inmates presently or in the future under sentence of death confined in a Missouri penitentiary. The original complaint alleged that death row inmates at the Missouri State Penitentiary were subjected to conditions and practices in violation of their constitutional rights under the First, Sixth, Eighth, and Fourteenth Amendments. Without an admission by appellees or a finding by the court that the conditions on death row were unconstitutional, the appellees entered into a consent agreement with the appellant class under which various improvements were to be made in the conditions and practices on death row at the Missouri State Penitentiary. Immediately after the settlement, and several months before the court entered a consent decree approving the settlement, appellees began complying with the agreement.

Approximately two years later, appellees filed a motion with the court to move the capital punishment unit from the Missouri State Penitentiary to the Potosi Correctional Center, which had been in the process of being built when the parties reached their initial settlement. The consent decree specifically anticipated a transfer of the capital punishment unit from the Missouri State Penitentiary to the Potosi Correctional Center when that facility was completed, Consent Decree at 19, and the new facility was built to accommodate a capital punishment unit. Order to Implement Consent Decree at Potosi at 3. The appellant class did not respond to appellees' motion to transfer the capital punishment unit and the District Court approved the motion in an order issued on March 13, 1989. It was not until after appellees had submitted

---

1. The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri.

their plan to implement the consent decree at Potosi and request for modifications in the decree consistent with that plan that appellants objected. Two weeks later the District Court entered an order approving appellees' request for modifications consistent with the implementation plan. In this appeal appellants challenge that order, arguing that the District Court was without authority to order any of the modifications or, in the alternative, was without authority to order modifications beyond those relating to the physical plant in which the death-sentenced inmates are housed.

 The district court retains authority over a consent decree, including the power to modify the decree in light of changed circumstances, and is subject to only a limited check by the reviewing court. *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976); *United States v. United Shoe Mach.,* 391 U.S. 244, 251, 88 S.Ct. 1496, 1500, 20 L.Ed.2d 562 (1968), *United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). We will reverse a district court's modification of a consent decree only upon a showing of an abuse of discretion. *See System Fed'n No. 91 v. Wright,* 364 U.S. 642, 650, 81 S.Ct. 368, 372, 5 L.Ed.2d 349 (1961). Moreover, the Supreme Court has indicated that a district court's resolution of a motion to modify is due greater deference when the changed circumstances justifying modification are of fact rather than law. *Wright,* 364 U.S. at 648, 81 S.Ct. at 371 ("[D]iscretion is never without limits and these limits are often far clearer to the reviewing court when the new circumstances involve a change in law rather than facts."). Here the changed circumstances were of fact: the capital punishment unit was to be moved to a new institution. Our standard of review is deferential; and we find no abuse of discretion in the modifications ordered by the District Court.

 Appellants do not and could not object to the movement of the capital punishment unit to Potosi. The possibility of such a transfer is expressly contemplated in the decree, as was the need for court-ordered modifications consequent upon such a transfer. The decree provides:

*New Facilities*

If defendants at some future date determine that it is necessary to expand death row housing beyond its present location ... or move death row to a new location, defendants shall file with the Court and serve upon counsel for the plaintiff class a plan for implementation of all rights and privileges conferred by this decree at the new or additional location(s). Defendants may begin housing death-sentenced inmates in such new or additional location(s) upon approval of the plan by the Court.

Consent Decree at 19. Because the changed circumstances, as well as the possibility of modifications, were fully foreshadowed in the original decree, it could be said that the changes ordered by the District Court were not modifications at all, but were part of the court's enforcement of the original terms of the decree pursuant to its continuing supervision.

But even had the decree made no mention of a possible future movement of the capital punishment unit to a new facility and, further, had neglected to assert the District Court's continuing authority over the decree, the court still would have had power to order modifications. "If the reservation [of power to modify the decree] had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery. A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Swift & Co.,* 286 U.S. at 114, 52 S.Ct. at 462 (citations omitted), *quoted in Wright,* 364 U.S. at 647, 81 S.Ct. at 371 (holding that there is no diminution of the court's power if the decree is the result of consent rather than litigation); *see also Wright,* 364 U.S. at 646, 81 S.Ct. at 371 ("[T]he *power* of the District Court to modify this decree is not drawn in question. That proposition indeed could not well be disputed."). Modification is appropriate "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have arisen." *Local No. 93, Int'l Assn. of*

*Firefighters v. City of Cleveland,* 478 U.S. 501, 527, 106 S.Ct. 3063, 3078, 92 L.Ed.2d 405 (1986) (quoting *Wright,* 364 U.S. at 646–47, 81 S.Ct. at 370–71). In the case at hand, the circumstance of the opening of a brand new correctional institution with facilities for a capital punishment unit, and to which appellees wished to transfer death-sentenced inmates, constitutes a changed circumstance sufficient to justify modifications in the decree with or without the specific provisions in the decree allowing for a transfer and for concomitant modifications.

Appellants argue that the changed circumstance must be both "unforeseen" and the cause of "grievous wrong." This claim, however, is taken from the discussion of a quite separate matter in *Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. In that case, the Supreme Court considered court-ordered alterations in a consent decree that constituted less a modification than a complete nullification of a significant portion of the consent decree. The original agreement in *Swift* settled an antitrust suit filed by the government against the five preeminent meat-packing companies accused of monopolizing the meat-packing industry as well as forming incipient monopolies in several other food-related industries. Under the decree the defendants were prohibited from engaging in restraints of trade in their meat-packing businesses and, in addition, from entering five other market areas, which they had begun to monopolize.

Two years after the settlement was entered as a consent decree, some of the defendants moved the court to strike the prohibition on their trading in the largest of those five markets—114 grocery items specifically enumerated in the decree. It was only after finding that the "[s]ize and past aggressions [that induced the fear of monopoly in 1920] leave the fear unmoved today," 286 U.S. at 117, 52 S.Ct. at 463, that the Court stated "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." 286 U.S. at 119, 52 S.Ct. at 464. The Court's description of the changed conditions necessary for the "modification" requested in *Swift* was, of course, not controlling since the Court found no changed circumstances whatsoever. But the greater distinction is that the modifications sought in that case consisted of eliminating entirely one of the central purposes of the agreement.

■ Appellees in the case before us, however, do not seek to compromise in any way the purpose of the decree, which is to provide constitutionally acceptable conditions of confinement for inmates on death row. The decree is simply a plan for ensuring that the capital punishment unit complies with constitutional requirements. Modifications in such an implementation plan would be proper even in the absence of those portions of the decree that specifically anticipate the changed circumstances and modifications at issue here. Thus, the only remaining question is whether the court-ordered modifications somehow fail to provide constitutional conditions of confinement for the prisoners in the capital punishment unit.

Appellants themselves stress that "[i]t was the intention of the parties and the Court to eliminate *any* conditions of confinement which may have denied death row inmates the rights, privileges, and immunities secured to them by the Constitution and the laws of the United States." Appellants' Brief at 7. Noticeable, however, is a the lack of specificity in appellants' brief regarding the ordered modifications. Indeed, beyond an oblique reference in their opening brief to the categories in which modifications were made, it is not until several pages into the reply brief that their objections to particular modifications can be discerned at all. Those changes that appellants believe to "substantially impact [ ]on important rights" include: a reduction of outdoor exercise time for close custody inmates from sixteen hours per week to four hours per week; a smaller outdoor exercise facility for medium custody inmates, which is not equipped for handball, basketball, baseball, or football; greater restrictions for some inmates on group religious services; limited telephone access time available for close custody inmates; and, finally, mail delays for up to "days at

a time." . Appellants' Reply Brief at 8–9. But the provision of handball and basketball courts or sixteen hours of outdoor exercise per week, for example, is not required by the Eighth Amendment's proscription against cruel and unusual punishment. Nor is it a requirement of the First Amendment that those duly convicted of murder[2] and sentenced to death be afforded more than one hour per week of telephone access for personal phone calls.[3] Indeed, on the present record we cannot say that any of the conditions of confinement at Potosi Correctional Center constitute grounds for an even colorable claim of a constitutional violation.

Moreover, even these most serious of appellants' complaints describe the conditions of confinement for only some of the inmates under sentence of death. Because the new institution in Potosi can accommodate a larger classification system, inmates there may be assigned to one of five custodial groups: Disciplinary Custody, Administrative Segregation, Close Custody, Medium Custody, and Minimum Custody. Minimum Custody inmates have roughly the same privileges as nondeath-row inmates in general custody. It is the fewer privileges of those within the more restrictive custodial classifications that appellants posit as the basis for their complaints with the modifications. While recreation time and other benefits are decreased for some inmates, those in the less restrictive classifications are accorded more recreation time and other additional benefits under the classification scheme at Potosi. Thus, almost all the objections appellants lodge against the modifications are aspects of the more finely calibrated classification system at Potosi.

Of this classification system—the fulcrum of their objections—appellants state:

It may be true that those inmates at the highest classification level receive benefits equal to and perhaps greater than they were afforded at MSP. Nonetheless, to ignore *the rights and privi-*

*leges of those unable, or perhaps, unwilling to attain the highest level of classification because of their behavior,* some of which is uncontrollable, is not justified merely because the Plaintiffs have been moved from Jefferson City to Potosi.

Appellants' Reply Brief at 12 (emphasis added). By contrast, appellees argue that the multi-tier classification system provides a significant incentive for good behavior while at the same time increasing security by separating those with serious behavior problems from the other inmates. Appellees' Brief at 11.

In a legal contest between those prison inmates who are "unable, or perhaps, unwilling" to conform their behavior to valid institutional norms, and those who administer the correctional institution, there can be no question of the victor.

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and

---

**2.** Of the 2,124 prisoners awaiting execution in this country in 1988, only one had received the death penalty for a crime other than murder (he had been convicted of raping a child). United

States Department of Justice, Bureau of Justice Statistics, Capital Punishment 1988 at 1.

**3.** Telephone access to attorneys was not altered by the modifications. Appellees' Brief at 9.

executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnotes omitted) *construed in Thornburgh v. Abbott,* —— U.S. ——, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459 (1989) (overruling *Martinez* to the extent that *Martinez* required a stricter standard of review for prison regulations than reasonableness). Were we to employ a de novo standard of review we would have no quibble with the modifications ordered by the District Court in this consent decree. We find no abuse of discretion. The order of the District Court is affirmed, without prejudice to the right of appellants to judicial recourse in the event the modified consent decree is violated or other unconstitutional practices or conditions can be shown.